IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JONATHAN JULIAN VEJARANO,
   Petitioner,

v.             Civil Action No. 3:22cv430

HAROLD W. CLARKE, Director,
Department of Corrections,
     Respondent.

## OPINION

Jonathan Julian Vejarano, a Virginia prisoner proceeding with counsel, filed a petition for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his conviction in the Circuit

Court of Spotsylvania County, Virginia (the "trial court"), for first degree murder, conspiracy to

commit first degree murder, and use of a firearm in the commission of a felony. Vejarano presents

the following claims:

Claim One: The Court of Appeals of Virginia erred in concluding that
     the prosecution did not violate due process by eliciting and
     failing to correct false and misleading testimony.

Claim Two: The Court of Appeals of Virginia erred in concluding that
     the Commonwealth satisfied due process under the
     Fourteenth Amendment by disclosing material impeachment
     information concerning a key witness.

(ECF No. 7, at 6–7.)

The respondent, Harold W. Clarke, has moved to dismiss the § 2254 petition. For the

reasons below, the Court will grant the respondent's motion to dismiss.

# I. BACKGROUND[1]

## A. Murder of Heather Ciccone

On the night of December 6, 2015, Heather Ciccone parked her car in a secluded driveway of a house in Spotsylvania County, Virginia. Text messages on Ciccone's cell phone indicated that she drove to the location to pick up marijuana. Shortly before midnight, a resident of the house noticed an unfamiliar car pull into the driveway and then quickly leave. When another resident went out to investigate, he found Ciccone in her car. Police officers arrived shortly thereafter and discovered Ciccone slumped forward in her driver's seat with a gunshot wound in the back of her head. An autopsy confirmed that Ciccone died from the gunshot wound. Police never recovered the murder weapon.

Ciccone had romantic ties to Joshua "Face" Williams, a drug dealer and member of the G-Shyne Bloods gang. In the weeks before her death, Ciccone received threats from the mother of Williams's child, Danielle Long, because of Ciccone's relationship with Williams. Vejarano had connections to Williams's drug activities but no connection to Ciccone.

Police began investigating Vejarano after another inmate at the jail sent an anonymous letter to police several months after the murder. (ECF No. 23-2,[2] at 55–56, Trial Tr. 29:11–30:21, May 30, 2018 ("May 30 Tr.").) A jailhouse informant claimed that "they had talked with somebody who had confessed to them about killing Heather Ciccone, shooting her in the head." (*Id.* at 57, May 30 Tr. 31:7–9.) In total, police spoke about Williams and Vejarano to "nine or ten"

---

[1] The parties elicited testimony from multiple witnesses and introduced many pieces of evidence during the proceedings, resulting in an extensive state court record. Though the Court recites only certain facts and testimony necessary to resolve the motion and petition, it has considered the entire record filed with the petition and the respondent's motion to dismiss to reach its conclusions.

[2] ECF No. 23-2 represents Volume II of the Appendix filed by the respondent. For all cited transcripts, the Court includes pin cites to both the ECF pagination and the trial transcript.

people at the jail, including "fix or six" inmates. (*Id.* at 57–58, May 30 Tr. 31:17–32:3.) On March 20, 2017, the Commonwealth indicted Jonathan Vejarano with first-degree murder, conspiracy to commit first-degree murder, and use of a firearm in the commission of a felony.[3] (*See* ECF No. 7, at 4.)

### B. *Trial Testimony*

Vejarano's seven-day jury trial began on May 29, 2018. Vejarano's petition focuses primarily on the testimony of Tristan Wargas, one of his fellow inmates. To resolve this petition, however, the Court must consider Wargas's testimony and letters in the context of the testimony of other inmates who served time with Vejarano. The Court, therefore, will summarize the testimony of several inmates who testified at Vejarano's trial.

Talmadge Burks testified that he temporarily occupied a holding cell next to an inmate who identified himself as Williams' co-defendant but never provided his name. (ECF No. 23–4, at 255,[4] Trial Tr. 229:20–61, June 1, 2018 ("June 1 Tr.").) Burks testified that this individual accused Burks of "snitching on him and his homeboy for doing what they did." (*Id.*, June 1 Tr. 229:6–7.) Although Burks confirmed that "the person [he] heard on the other side of the cell was bragging about the murder of Heather Ciccone," (*id.* at 315, June 1 Tr. 289:14–16), Burks testified that the individual "did not say he actually killed her," (*id.* at 257, June 1 Tr. 231:2–3). Burks also testified that he had stolen guns from his mother's house and sold the guns to another individual, Jeffery Brown, in exchange for heroin.[5] (*See id.* at 242–43, June 1 Tr. 216:9–217:19.) He told a deputy

---

[3] A jury found Williams guilty in a separate trial.

[4] ECF No. 23-4 represents Volume IV of the Appendix filed by the respondent.

[5] During the trial, Jeffery Brown testified that Williams bought a gun from him on December 4, 2015, days before Ciccone's murder. The gun contained bullets that Brown had handled in the weeks before the murder. (*Id.* at 81–87, June 1 Tr. 55:17–61:2.) The only

that he "sold [a] gun to the murderer" and "would have to live with it for the rest of [his] life." (*Id.* at 296, June 1 Tr. 270:1–7.) When asked whether the Commonwealth could file a motion to reconsider his sentence, Burks testified, "[n]ot to [his] knowledge" but said that the Commonwealth could "make it easier" for him because after Williams's trial, Burks "had a really hard time" when he got back to prison. (*Id.* at 237, June 1 Tr. 211:16–21.)

Jovann Paige, a former member of the G-Shyne Bloods gang, lived in the same pod as Vejarano. Paige testified that Vejarano told him that, "I just see her eyes . . . her eyes, I keep seeing it, I keep seeing it in my sleep." (ECF No. 23-5, at 265,[6] Trial Tr. 239:17–19, June 4, 2018 ("June 4 Tr.").) Vejarano reportedly described "her" as a "girl with blue eyes" and "[b]lond hair," which matched Ciccone's description. (*Id.* at 266, June 4 Tr. 240:3–9.) Paige also testified that Vejarano bragged that he "hit [the girl with blond hair and blue eyes] in the back of the head" as part of a bargain with Williams for membership in the G-Shyne Bloods gang. (*Id.* at 266–71, June 4 Tr. 240:18–245:17.) At the end of his testimony, Paige confirmed that he had no "doubt in [his] mind that when [Paige] w[as] talking to Mr. Vejarano he was talking about murdering Heather Ciccone." (*Id.* at 310, June 4 Tr. 284:14-17.)

Ezra Randall who shared a cell with Vejarano for a month, testified that Vejarano told him that "God would never accept" Vejarano because her "shot her." (*Id.* at 319, June 4 Tr. 294:1–4.) Although Vejarano did not name Ciccone at first, "it was common knowledge that he was snitching on his codefendant that he shot somebody." (*Id.* at 320, June 4 Tr. 294:8–10.) As their relationship developed, Vejarano told Randall that "he shot her and it was killing him inside. He couldn't live

---

identifiable DNA evidence that the Commonwealth found at the murder scene was Brown's DNA on an unspent casing in the driveway. (ECF No. 23-3, at 344, Trial Tr. 318:13–17, May 31, 2018 (Volume III of the Appendix Filed by the respondent).)

[6] ECF No. 23-5 represents Volume V of the Appendix filed by the respondent.

4

with himself mentally . . . . That's kind of eating up his insides." (*Id.* at 320–21, June 4 Tr. 294:21–295:4.) Randall testified that Vejarano "didn't know if when . . . everything came to come to fall down, if 'Face' was going to tell on him or if 'Face' was going to hold his water." (*Id.* at 324, June 4. Tr. 298:8–10.) According to Randall, Vejarano recounted that "'Face' was having a relationship with [Ciccone] and . . . her and 'Face' had had a couple altercations that led to 'Face''s girlfriend . . . telling 'Face' that he needed to get rid of [Ciccone]." (*Id.* at 328, June 4 Tr. 302:2–6.) Randall also testified that "the only detail [Vejarano] really gave [Randall about the murder] was that 'Face' was with him and that he shot her in the back of the head." (*Id.* at 338, June 4 Tr. 312:2–4; *see also id.* at 339, June 4 Tr. 313:10–12 ("[T]hat's when 'Face' made the call to tell Jonathan to shoot her, and that's when Jonathan shot her.").)

Steven Williams[7] and Anthony Digges were cellmates who shared a cellblock with Vejarano. Steven Williams and Vejarano got to know each other over several months and would "walk around and talk." (ECF No. 23-6, at 53,[8] Trial Tr., 27:7–8, June 5, 2018 ("June 5 Tr.").)[9] Vejarano asked Steven Williams hypothetical questions, such as if "another one of his friends was in trouble . . . [, whether] they had to have a murder weapon in order to prove a murder." (*Id.* at 54, June 5 Tr. 28:6–8.) One day, Vejarano "just started crying" and "blurted out [that he] killed her. And [Steven Williams] said killed who, and he said Heather." (*Id.* at 56, June 5 Tr. 30:4–9.) Vejarano said that he was talking about "the girl in the newspaper" and "mentioned that . . . every

---

[7] The Court refers to Vejarano's co-defendant, Joshua "Face" Williams, as "Williams" or "Face" and witness Steven Williams as "Steven Williams."

[8] ECF No. 23-6 represents Volume VI of the Appendix filed by the respondent.

[9] At the beginning of his testimony, Steven Williams explained that he had no current charges, had "nothing to gain by being [t]here," and "fear[ed] for [his] own safety." (*Id.* at 45–48, June 5. Tr. 19:20–22:13.)

time he closes his eyes he sees her face and he just sees the blood and he can't sleep at night." (*Id.*, June 5 Tr. 30:12–13, 30:20–21.) Steven Williams also testified that Vejarano said that "he felt stupid and . . . that he looked at Face as a brother to him. And, . . . now he feels like he was just a pawn because . . . nobody is there for him." (*Id.* at 58, June 5 Tr. 32:7-10.) Steven Williams also testified that Vejarano told him that "when Face exited the vehicle that was [Vejarano's] cue to shoot her and then exit the vehicle himself."[10] (*Id.* at 60, June 5 Tr. 34:12–14.)

Anthony Digges testified that he overheard Vejarano tell Steven Williams that "he couldn't sleep. He was having dreams from when he shot the girl, Heather, in the car." (ECF No. 23-5, at 357, June 4 Tr. 331:16–17.) He also testified about Vejarano's description the murder, including that "'Face''s baby-mama wanted [Face] to have Johnny kill [Ciccone] and that Johnny had agreed to do it for initiation into a G-Shyne Blood gang." (*Id.* at 358, June 4 Tr. 332:18–20.) Vejarano told Digges and Steven Williams that "[h]e was up front sitting next to Heather, [and] 'Face' was in the back sitting next to his baby-mom. . . . [H]e said that he reached over with a pistol, shot her in the back of the head, and then left the scene." (*Id.* at 359, June 4 Tr. 333:1–6.)

Tristan Wargas, a fellow inmate and the witness at issue in Vejarano's petition, testified that when he first approached Vejarano, he had "hear[d] bits and pieces of him being linked to a murder." (*Id.* at 190, June 4 Tr. 164:12–13.) Wargas warned Vejarano about "Burks telling on him about selling the gun to . . . Mr. Brown," to which Vejarano responded, "I'm not worried about it. They can't tie me to it. He can't hurt me." (*Id.* at 190, June 4 Tr. 164:6–19.) During their second conversation, Vejarano told Wargas that he "didn't shoot that girl. And then later on, . . . [they] had a third conversation and it was . . . about this case and [Vejarano] was like, I didn't

---

[10] During cross-examination, Steven Williams conceded that during an interview with detectives he believed "there were four people that were present during the murder: Ms. Ciccone, Ms. Long, Face, and Jonathan Vejarano." (*Id.* at 97–98, June 5 Tr. 71:20–72:5.)

mean to shoot Heather." (*Id.* at 191, June 4 Tr. 165:6–15; *see also id.* at 193, June 4 Tr. 167:2–17.) In March 2017—after the Commonwealth charged Vejarano but before detectives had interviewed Wargas—Vejarano told Wargas, "I'm hit for what I did. I'm burned. I'm going down. And, . . . once again, he said I should never have shot Heather." (*Id.* at 194, June 4 Tr. 168:12–14.) Wargas told Vejarano to "stop talking," but Vejarano "kept on talking." (*Id.*, June 4 Tr. 168:17–18.) That same month, before talking to police, Wargas wrote a letter to another inmate calling Vejarano a "dumbass" and an "idiot" for talking to other inmates and saying that "Talmadge Burks told on him – told them about the gun he's down at SP-5 on PC because he told him how he sold the gun that killed that twenty-one-year-old girl to the cops." (*Id.* at 197, June 4 Tr. 171:1–9.)

The trial court admitted Wargas as an expert on "plucking," a tattooing method used in prison. (*Id.* at 180–84, June 4 Tr. 154:9–158:20.) Wargas testified that Vejarano plucked five five-pointed stars, two casings, and "what appears to be a bullet hole" onto his existing tattoo sometime after May 2016. (*Id.* at 174–78, June 4 Tr. 148:17–149:1, 150:7–152:21; *id.* at 184, 158:1–6.) Only Wargas testified about the nature and timing of these new tattoos.

During direct examination, the Commonwealth also asked Wargas about his twenty-eight prior felony convictions and his active fifteen-year sentence. (*Id.* at 166, June 4 Tr. 140:1–20.) Then, it asked about whether he might get his sentence reconsidered because of his testimony:

> Q    [I]t's possible that you could have a portion of [your] sentence reconsidered; is that true?
> A    Yes, I believe so.
> Q    You've not been promised anything?
> A    No, I have not.
> Q    To come here and testify?
> A    No, I have not.

(*Id.* at 166–67, June 4 Tr. 140:21-141:7.)

7

During cross-examination, Wargas agreed he made statements to police in May 2017 that were not consistent with his trial testimony. (*Id.* at 214–15, June 4 Tr. 188:16–189:12.) Although police offered to help him with his eighteen-year sentence, Wargas said he originally told the police "hearsay because [he] did not want to be used as testimony in this case" but that he "had[] a change of heart" and "want[ed] to do right by the family." (*Id.* at 229, June 4 Tr. 203:12–13; *see also id.* at 239, June 4 Tr. 205:2–5 (admitting that he lied to police during the interview).) He explained,

> I didn't want to go to prison with the label snitch on my name, so that's why I'm deciding to do the right thing now. I've done a lot of wrong in my life, so I'm changing, you know, trying to make some amends. Even though this isn't going to help me out, all it's going to do is cause me problems, but I'm still doing this to help the family get some closure.

(*Id.* at 228, June 4 Tr. 202:4–12.) When defense counsel asked whether he had "anything to lose in coming here today in making [his] statements," Wargas maintained that he "wasn't offered anything" and that "I'm not getting no time off. I'm not helping myself in any way." (*Id.* at 240, June 4 Tr. 214:6–19.). But he acknowledged that he was still eligible for a sentence reduction. (*Id.* at 242–43, June 4 Tr. 216:10–18.) On redirect, Wargas reiterated that he had changed his testimony to "make some amends" and give Ciccone's "family some closure." (*Id.* at 245, June 4 Tr. 219:2–21.)

During closing arguments, the Commonwealth referred to, among other evidence, the testimony of Burks, Paige, Randall, Steven Williams, Digges, and Wargas. (*See* ECF No. 23-6, at 290–93, Trial Tr. 31:3–34:2, June 6, 2018 ("June 6 Tr."); *id.* at 310–21, June 6 Tr. 51:18–61:17.) It also reviewed the testimony of other witnesses. (*See, e.g., id.* at 306–10, June 6. Tr. 47:5–51:18.) The Commonwealth referred to Vejarano's tattoo as "a murder mural": "one bullet hole in the back of Heather's head, two shell casings left at the scene, five five-pointed stars. Blood symbology." (*Id.* at 290–93, June 6 Tr. 31:20–33:7, 34:3–6; *see also, e.g.*, *id.* at 290, June 6 Tr. 31:3–7

8

("Vejarano confessed to Steven Williams sitting at this table with all those little chess pieces where you get the blackness to put into your hand to memorialize your murder.").)   It argued that Vejarano added the details so that he could remember and brag about murdering Ciccone.  (*See, e.g., id.* at 291–92, June 6 Tr. 32:17–33:7.).   The Commonwealth reiterated the meaning of Vejarano's tattoo at the end of its closing argument.  (*See id.* at 320–21, June 6 Tr. 61:20–62:10.) The Commonwealth discussed these witnesses and the tattoo again in its rebuttal argument.  (*See id.* at 393–426, June 6 Tr. 134:17–167:7.)  The jury found Vejarano guilty on all counts.

### C.  *Motion to Set Aside the Verdict*

The Commonwealth received a letter from Wargas dated June 10, 2018, in which he stated, "Now I know I said that I wasn't going to reach out to my lawyers about doing a motion to reconsider my time.  Well we both know that was a lie."  (ECF No. 23-7,[11] at 406.)  He had already reached out to his lawyers about filing a motion to reconsider his sentence, and he needed the Commonwealth to "do [him] this solid."  (*Id.*)  The Commonwealth disclosed the letter to defense counsel on June 15, 2018, and explained that it had already reached out to Wargas's attorney about a motion to reconsider before receiving the letter but was "passing [the letter] along because of the exculpatory statement about what his intent was in reaching out to his attorney."  (*Id.* at 405.)  In response to defense counsel's concerns about the letter, the Commonwealth then explained,

> When we talked to him before trial we talked about him being eligible for a motion to reconsider.  We told him we'd take a look at getting his sentence reconsidered, if possible.  We didn't talk about who would reach out to his attorneys or how it would happen or anything like that. . . . We told him we wanted to do right and we'd try to keep his name out of the paper and treat him fair with reconsidering his sentence, if he wasn't shipped off to DOC immediately after the trial.
>
> . . .

---

[11] ECF No. 23-7 represents Volume VII of the Appendix filed by the respondent.

> We did not know or agree that he would 'lie' about his desire to reach out to his attorney after trial or anything like that . . . We had never discussed him reaching out to his attorney or not.
>
> . . . I do believe we talked about him having the ability to have his sentence reconsidered to the jury, both when he testified and in closing argument.
>
> I told Wargas he had to be a man and do the right thing. That's when he agreed to testify. He was and is scared.

(*Id.* at 408.)

The Commonwealth later disclosed a second letter in which Wargas wrote that the Commonwealth "lied to [him] about **doing [him] a solid** with [his] cases" and claimed that the Commonwealth's Attorney "told [him] to say Vajerono [sic] killed Heather in his murder trial." (ECF No. 7, at 18 (quoting Ex. S, at 62.)  Wargas continued, "I wish I never would have listened to you and believed you would help me with my sentences. **For all I know you told other people to lie for you. For all I know Vajerono [sic] is innocent.**"  (*Id.*)

On August 1, 2018, Vejarano filed a motion to set aside the verdict.  He also requested subpoenas for three of the Commonwealth's attorneys to testify about Wargas during the motion hearing.  Vejarano argued that "Wargas' entire testimony . . . was based on a lie" and "Wargas' testimony was vital to the prosecution's case."  (ECF No 23-7, at 386.)  He therefore asked the Court to find that Wargas "perjured himself during the trial, that the Commonwealth was aware of his intent to perjure himself, the Commonwealth failed to disclose" that it knew of Wargas's perjury, and his perjury "extend[ed]" to his entire testimony.  (*Id.*)

At a hearing on October 29, 2018, the trial court denied Vejarano's motion.  It concluded "it's really not clear that [Wargas] perjured himself," and it did not find his recantation "convincing at all."  (ECF No. 23-8,[12] at 58–59, Hr'g Tr. 32:10–11, Oct. 29, 2018 ("Oct. 29 Tr."); *id.* at 59,

---

[12] ECF No. 23-8 represents Volume VIII of the Appendix filed by the respondent.

Oct. 29 Tr. 33:5–6.)  Moreover, the trial court considered Wargas's allegedly false statements immaterial in light of the other evidence.  (*Id.* at 61, Oct. 29 Tr. 35:5–14.)  It also concluded that "there[] [was no] . . . convincing evidence at all[] that the Commonwealth somehow suborn[ed] perjury in this case."  (*Id.* at 61–62, Oct. 29 Tr. 35:15–36:6.)  The trial court sentenced Vejarano to life imprisonment for the murder charge, five years' imprisonment for the conspiracy charge, three years' imprisonment for the firearms charge, and a "supervised period" of three years.  (*Id.* at 86, Oct. 29 Tr. 60:4–17.)

### D.  The Appeal

On January 31, 2019, Vejarano appealed to the Court of Appeals of Virginia (the "Court of Appeals").  The Court of Appeals affirmed Vejarano's convictions on May 12, 2020.  (*See* ECF No. 23-12.)  With respect to Vejarano's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), the Court of Appeals held:

> Appellant contends that the Commonwealth failed to disclose that it discussed the possibility of a motion to reconsider Wargas' sentence.  However, the testimony elicited by the Commonwealth of Wargas plainly belies this argument.  During direct examination of Wargas, the Commonwealth asked Wargas whether there was a possibility that a portion of his active sentence could be reconsidered later as a result of his testimony.  Wargas admitted that that was true; he only denied that he was promised anything.  Therefore, by eliciting the testimony itself, the Commonwealth made such impeachment evidence available to appellant at a point when appellant had sufficient time to make use of it.  Accordingly, *Brady* was not violated as a matter of law.

(*Id.* at 11–12.)  The Court of Appeals also rejected Vejarano's claim under *Napue v. Illinois*, 360 U.S. 264, 266 (1959), holding:

> The trial court made an explicit finding that Wargas did not perjure himself, and that finding is not plainly wrong.  Appellant relies on Wargas' statements that he was not promised anything by the Commonwealth.  He juxtaposes these with the Commonwealth's admission that it "told [Wargas] we'd take a look at getting his sentence reconsidered" and would "try to do him a solid."  But, neither of these statements are promises.  They are conditional, aspirational statements.  Indeed,

> they match Wargas' testimony that, although he wasn't promised anything, he was
> eligible to have his sentence reconsidered due to his testimony in appellant's case.
> Therefore, the trial court's finding is supported by the evidence and this Court will
> not disturb that finding.

(*Id.* at 13.) The Court of Appeals did not discuss the materiality of the evidence under *Brady* or

*Napue*. The Court of Appeals then denied Vejarano's other claims related to his motion to set

aside the verdict and motion for subpoenas. It explained that for both those arguments, Wargas's

testimony "was not material in the light of the Commonwealth's other evidence." (*Id.* at 14; *see*

*also id.* at 17.)

Vejarano appealed the Court of Appeals's decision to the Virginia Supreme Court. The

Virginia Supreme Court refused Vejarano's petition without issuing an opinion on January 11,

2021, (*see* ECF No. 23-13), making the Court of Appeals's decision the last reasoned decision in

this case. *See Grueninger v. Dir., Va. Dep't of Corrs.*, 813 F.3d 517, 525–26 (4th Cir. 2016).

Vejarano then filed a petition for federal habeas relief in this Court. The respondent now moves

to dismiss Vejarano's petition.

### III. ANALYSIS[13]

#### A. Habeas Standard

To obtain federal habeas relief, a petitioner must demonstrate that he is "in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

Antiterrorism and Effective Death Penalty Act of 1996 further circumscribes the Court's authority

---

[13] Vejarano must satisfy two threshold issues for the Court to consider his eligibility for federal habeas relief. First, he must have exhausted all available state-level remedies before filing his petition under § 2254. Second, he must present only claims that have not procedurally defaulted. *See* 28 U.S.C. § 2254(c) (establishing the procedural default bar to habeas relief). Here, the parties agree—and the record supports—that Vejarano exhausted his state remedies, and neither party argues that Vejarano has procedurally defaulted either of his claims. The Court, therefore, will proceed directly to the merits of Vejarano's claims.

to grant relief by way of a writ of habeas corpus.  28 U.S.C. § 2254 *et seq.*  A federal court may not grant a writ of habeas corpus based on any claim adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d).  "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Under § 2254(d)(1), a state court decides a case "'contrary to' clearly established federal law 'if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Tyler v. Hooks*, 945 F.3d 159, 166 (4th Cir. 2019) (alterations in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision results in an "unreasonable application of clearly established federal law" when the decision "[was] 'so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*.'" *Burr v. Jackson*, 19 F.4th 395, 403 (4th Cir. 2021) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)), *cert. denied*, 143 S. Ct. 151 (2022).  Put another way, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003) (quoting *Williams*, 529 U.S. at 411).

13

Under § 2254(d)(2), a federal habeas court may only find that a state court based its decision on an "unreasonable determination of facts" where "the factual determination [is] sufficiently against the weight of the evidence that it is objectively unreasonable, which means it must be more than merely incorrect or erroneous." *Burr*, 19 F.4th at 403 (quotations omitted) (alteration in original). The court must presume "a determination of a factual issue by a State court . . . to be correct" unless the petitioner can rebut the determination "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "[I]f reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Burr*, 19 F.4th at 408–09 (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

"If [the habeas] standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* This high level of deference governs all legal determinations in habeas review and places a substantial burden of proof on the petitioner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in the existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The Court considers Vejarano's *Napue* and *Brady* arguments against this standard.[14]

---

[14] The respondent also argues that "[i]n neither of [his] claims does Vejarano, by counsel, allege that he is being held in violation of the Constitution—instead he focuses on the appellate court rulings as if this was a direct appeal." (ECF No. 23, at 21.) The respondent therefore asks the Court to dismiss Vejarano's petition because, "[w]hile his petition contains allegations of Constitutional violations in certain sections, the verbatim 'grounds' listed are not proper in this Court" and do not comply with § 2254. (*Id.*) Because Vejarano has not established that he is entitled to relief under either *Napue* or *Brady*, the Court will not reach this argument.

### B. *Claim One:* **Napue** *Violation*

#### 1. *Legal Standard*

In *Napue*, the Supreme Court held "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. "A *Napue* claim requires a showing of the falsity and materiality of testimony and the prosecutor's knowledge of its falsity." *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002). The use of false testimony violates due process "regardless of whether the Government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected." *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). "False testimony includes both perjury and evidence that, 'though not itself factually inaccurate, . . . creates a false impression of facts which are known not to be true.'" *Burr*, 19 F.4th at 410 (quoting *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967)). The Supreme Court, however, does not "automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2nd Cir. 1968)). Instead, a court must set aside a conviction obtained by the knowing use of such testimony "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Burr*, 19 F.4th at 410 (quoting *United States v. Chavez*, 894 F.3d 593, 601 (4th Cir. 2018)); *see also Juniper v. Davis*, 74 F.4th 196, 211–212 (4th Cir. 2023).

#### 2. *Analysis*

##### a. *Court of Appeals's Decision*

Vejarano contends that the Court of Appeals erred in three ways: (1) by applying the wrong legal standard, (2) by failing to address "the falsity of Mr. Wargas's testimony when he 'wasn't

offered anything'" in light of its later admissions about their pre-trial conversations, and (3) by failing to address whether Wargas misled the jury by asserting that he was testifying for altruistic reasons. (ECF No. 7, at 22.)  The respondent moves to dismiss because "[t]he Court of Appeals decision is not factually inaccurate or in violation of federal law, much less unreasonable." (ECF No. 23, at 25.)  The Court agrees with the respondent.

First, Vejarano has presented no clear and convincing evidence to disturb the Court of Appeals's factual determination that "[t]he trial court made an explicit finding that Wargas did not perjure himself, and that [that] finding is not plainly wrong." (ECF No. 23-12, at 14).  After ruling that "the evidence is [not] very clear at all that there was perjury in this case," the trial court went on to comprehensively explain why Wargas's letters merely demonstrated that he had "regrets about testifying" and "suggest[ed] to the Court that this is something he's thought about since he's testified and he's not [sic] starting to change his mind." (ECF No. 23-8, at 54–62, Oct 29 Tr. 28:16–36:10.)  It pointed out that "it was argued to the jury that they shouldn't believe [Wargas's claim that he would not want his sentence reconsidered] because of course he wanted to reconsider his sentence." (*Id.* at 58, Oct. 29 Tr. 32:12–20.)  It also explained that Wargas's "sentence was apparently not reconsidered and he's not very happy with the Commonwealth about that.  So, I just don't think that is a later recantation." (*Id.* at 59, Oct. 29 Tr. 33:9–12.)  Moreover, the trial court explained why the testimony was immaterial "even if we accept . . . *for the purposes of an argument* that he perjured himself." (*Id.* at 60, Oct. 29 Tr. 34:2–4 (emphasis added).)  The trial court clearly did not believe Wargas's letter or that Wargas had lied on the stand.  The Court of Appeals, therefore, reasonably characterized this as a finding that "Wargas did not perjure himself." (ECF No. 23-12, at 13.)  The Court must presume the Court of Appeals's "determination

of [that] factual issue . . . to be correct," and Vejarano has not pointed to any clear and convincing evidence to overcome this presumption.  28 U.S.C. § 2254(e)(1).

Second, Vejarano has not established that the Court of Appeals applied the wrong legal standard by improperly confining its analysis to perjury.  Although Vejarano contends that the Court of Appeals only considered perjury in its analysis, the Court of Appeals considered Vejarano's *Napue* claim in a section titled, "Allegedly False Testimony" and cited two Virginia Supreme Court cases that relied on *Napue* and discussed its applicability beyond perjured statements.  *See Hash v. Dir. of Dep't of Corr.*, 278 Va. 664, 686 S.E.2d 208 (2009); *Teleguz v. Commonwealth*, 273 Va. 458, 643 S.E.2d 708 (2007).  This suggests that the Court of Appeals understood that *Napue* applied more broadly than perjury even though the Court of Appeals at times seems to have used the term "false testimony" and "perjury" interchangeably.

Third, Vejarano draws a distinction between Wargas saying the Commonwealth did not *offer* him anything and the Court of Appeals's discussion of whether the Commonwealth had *promised* him anything, urging the Court to conduct a de novo review of whether Wargas's testimony that the Commonwealth had not offered him anything "was false or created a false impression."  (ECF No. 7, at 26.)  Yet the Court of Appeals made clear that it considered all the relevant conduct—both Wargas's testimony about the motions to reconsider and his purported altruism, and the Commonwealth Attorney's post-trial disclosures—in its decision.  In its background discussion, the Court of Appeals recounted the Commonwealth's disclosure to defense counsel that it discussed possibly looking into having Wargas's sentence reconsidered and the other "offers" Verajano relies on in his arguments.  (ECF No. 23-12, at 8–9.)  In its analysis, the Court of Appeals went beyond simply concluding that the trial court did not err when determining Wargas had not perjured himself.  It went on to analyze the Commonwealth's description of its

pre-trial conversations with Wargas against Wargas's testimony, finding the description and Wargas's testimony consistent. And it explained how it interpreted the Commonwealth's statements to Wargas about his motion to reconsider as "conditional, aspirational statements," not promises. (*Id.* at 19.) Regardless of whether a court could have reached a different conclusion on these facts, the analysis sufficiently justifies its conclusions that Wargas did not falsely testify and that no *Napue* violation occurred.

Fourth, Vejarano argues that the Court of Appeals failed to consider whether Wargas's testimony created a false impression that the Commonwealth's Attorney had a duty to correct at trial. The Court of Appeal's decision does not expressly discuss the misleading impression that Wargas's testimony may have created. But again, in the background section, the decision recounted the alleged false or misleading parts of Wargas's testimony and explained that "Wargas stated that he changed his mind and decided to testify as a way of making some amends." (ECF No. 23-12, at 7.) In its analysis, the Court of Appeals considered the veracity of Wargas's statements by comparing his testimony with the Commonwealth's version of their pre-trial discussions, which arguably also bears on the misleading nature of that testimony. In doing so, the Court of Appeals concluded the Commonwealth made "conditional, aspirational statements" rather than any promise. That conclusion suggested that Wargas's testimony would have had little, if any, misleading effect on the jury. [15] Thus, the Court cannot conclude that the Court of Appeals

---

[15] Moreover, Vejarano draws too fine of a line between an "offer" and a "promise." Black's Law Dictionary defines an "offer" as "[a] *promise* to do or refrain from doing some specified thing in the future, conditioned on an act, forbearance, or return promise being given in exchange for the promise or its performance." *Offer*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added). Thus, the Court can reasonably read the Court of Appeals's discussion of the "promises" the Commonwealth did, or did not, make to Wargas to also incorporate the "offers" as defined by Vejarano.

failed to consider the impression Wargas's testimony made on the jury, much less that it applied *Napue* in an "objectively unreasonable" manner. *See Lockyer*, 538 U.S. at 75–76.

In sum, even though the Court of Appeals did not expressly discuss the false impression Wargas's testimony may have made or explicitly tick through every detail of Wargas's testimony in its analysis, the Court of Appeals reasonably analyzed the record within the parameters of *Napue* sufficient to survive habeas's deferential review. *See Schriro*, 550 U.S. at 473; *Lockyer*, 538 U.S. at 75–76 ("[A] federal habeas court may not issue the writ simply because . . . the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable.")

### *b. Materiality*

Even if the Court concluded that the Court of Appeals misapplied *Napue*, however, Vejarano has still failed to establish that Wargas provided material testimony that would entitle him to relief. A "new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976) (quotations and citation omitted). Here, Vejarano's claim also fails because "the State's case was not so entirely reliant on [Wargas], or on [his] descriptions of the [tattoo], as he suggests." *Burr*, 19 F.4th at 410.

Vejarano contends that "[e]ach of the statements [at issue in this petition] went directly to Wargas's credibility. He came across at trial as a reformed sinner looking for redemption, testifying at risk to himself for no reason other than his conscience." (ECF No. 7, at 28.) Yet the parties elicited testimony that impeached Wargas and gave the jury more than enough evidence to assess—and question—his credibility. *See Burr*, 19 F.4th at 410 (holding that the defendant failed to establish materiality because "even without the suppressed [evidence], it is apparent from the

trial evidence alone that [the witness] was an imperfect witness, a point that defense counsel could and did drive home to the jury"). Both the Commonwealth and the defendant cross-examined Wargas about his eligibility for the Commonwealth to file a motion to reconsider his sentence, and he admitted that he was eligible. Wargas also admitted that he had lied to police initially and acknowledged the inconsistency between his pretrial and trial testimony. These aspects of Wargas's testimony bore on his credibility and called into question his claims of altruism.

Moreover, the evidence arising from Wargas's letter would not have seriously changed the landscape of the evidence at trial. In the letter, Wargas speculated that the Commonwealth *might* have told other inmates to lie and that Vejarano *might* be innocent. To be sure, none of the inmates who testified—including Wargas—presented as perfect witnesses. But Randall, Steven Williams, and Digges each testified about statements Vejarano described shooting Ciccone. The details of each of their testimonies generally aligned with and supported one another. Further, Wargas's letter to the other inmate sent before the police initially interviewed him generally aligned with Burks's testimony about telling the police about the gun. In addition, though Vejarano contends "Mr. Wargas offered the only testimony at trial about a confession by Mr. Vejarano that was supported by supposed altruism rather than undermined by demonstrated self-interest," (ECF No. 28, at 4), Steven Williams admitted that he had "nothing to gain" by testifying against Vejarano, (ECF No. 26-6, at 47, June 5 Tr. 21:19–21), and Burks testified that he did not believe the Commonwealth could move to reconsider his sentence at that point, (ECF No. 23-4, at 237, June 1 Tr. 211:16–21.) Wargas's post-trial assertion that he lied at trial and his unsupported suggestion that maybe the other inmates lied too do not meaningfully undermine their testimony or credibility such that there would be "any reasonable likelihood [this evidence would] have affected the judgment of the jury." *Boone*, 541 F.2d at 451; *cf. United States v. Lighty*, 616 bF.3d 321, 375

20

(4th Cir. 2010) ("Post-trial recantations of testimony are 'looked upon with the utmost suspicion'.") (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973)).

Finally, Vejarano overstates the importance of Wargas's testimony about the nature and timing of the Vejarano's prison tattoo. Indeed, this case differs greatly from cases where the witness gave false or misleading testimony critical to the outcome of the case.[16] Although the Commonwealth wove the tattoo through its closing argument, much of the Commonwealth's closing argument focused on other evidence, such as cell phone records, ballistics, and the testimony of the other jailhouse informants and witnesses. And, as discussed above, Wargas's testimony and subsequent recantation do little to undermine the testimony of the other inmates who testified about Vejarano discussing his role in the murder. Though the testimony regarding the prison tattoo added color to the Commonwealth's theory of the case, the other evidence overwhelmed that testimony.

---

[16] *E.g.*, *Boone*, 541 F.2d at 453 ("Only Hargrove testified concerning the details of the robbery from direct observation; his testimony was critical to the conviction. Without him the jury would have known only of vague admissions and weak circumstantial evidence linking him to the robbery."); *Campbell v. Reed*, 594 F.2d 4, 8 (4th Cir. 1979) ("Miller's testimony was extremely important since he was the only witness who could link Campbell to the burglary in question. The other evidence introduced at trial consisted of a confession signed by Campbell and the testimony of a police detective that Campbell pointed out other residences that he allegedly had broken into."); *Giglio*, 405 U.S. at 154–55 ("Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."); *Napue*, 360 U.S. at 266 ("Hamer's testimony was extremely important because the passage of time and the dim light in the cocktail lounge made eyewitness identification very difficult and uncertain, and because some pertinent witnesses had left the state. On the basis of the evidence presented, which consisted largely of Hamer's testimony, the jury returned a guilty verdict and petitioner was sentenced to 199 years.").

For these reasons, even if the Court of Appeals erred when applying *Napue*, Vejarano has failed to establish that the false testimony would "in any reasonable likelihood have affected the judgment of the jury." *Boone*, 541 F.2d at 451.

### C. *Claim Two:* Brady *Violation*

#### 1. *Legal Standard*

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  To obtain relief under *Brady*, Vejarano must "'demonstrate that the evidence was' (1) 'suppressed by the prosecution;' (2) 'favorable to the defendant, either because it [was] exculpatory or impeaching;' and (3) 'material.'" *Burr*, 19 F.4th at 409 (quoting *Horner v. Nines*, 995 F.3d 185, 204 (4th Cir. 2021)) (alteration in original).  Under *Brady*, materiality means more than "a 'reasonable probability' of a different result . . . .  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  In other words, "a reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quotations omitted).

#### 2. *Analysis*

Vejarano's *Brady* claim rests on the same assertion as its *Napue* claim: that the Commonwealth failed to disclose material impeachment evidence related to Wargas.  The respondent contends that "Vejarano's suppression of evidence claim fails both because the Commonwealth did not suppress any evidence and because the overwhelming proof of his guilt

refutes any claimed reasonable probability of a different result at trial, but for the alleged non-disclosure." (ECF No. 23, at 35.) Vejarano's claim fails under both the suppression and materiality prongs.[17]

With respect to the suppression prong, the Court of Appeals held that the Commonwealth did not fail to disclose that it discussed the possibility of a motion to reconsider the sentence because the Commonwealth asked Wargas during its direct examination "whether there was a possibility that a portion of his active sentence could be reconsidered later as a result of his testimony." ((ECF No. 23-12, at 11–12.) It explained that "Wargas admitted that that was true; he only denied that he was promised anything." (*Id.*) The Court of Appeals determined that, "by eliciting the testimony itself, the Commonwealth made such impeachment evidence available to appellant at a point when the appellant had sufficient time to make use of it." (*Id.* at 12.)

Vejarano argues "the supposed disclosure was not specific or complete enough to be useful." (ECF No. 28, at 20.) As previously discussed, the Court of Appeals reasonably accepted the trial court's conclusion that Wargas never perjured himself. After the Commonwealth asked Wargas about his eligibility for a sentence reduction, defense counsel dug further into that topic on cross-examination. And because Wargas admitted that he was eligible to have his sentence reconsidered regardless of his claims of altruism, the Commonwealth had no additional information to disclose except its vague statement to Wargas that it would look into reconsideration of his sentence. Although a court may have reached a different conclusion of these facts, on habeas review, the Court must not decide whether "the state court's determination was incorrect"; it must decide "whether that determination was unreasonable—a substantially higher

---

[17] Although the Court agrees with the ultimate conclusion argued by the respondent, it reaches that conclusion for different reasons than those set forth in the respondent's brief.

threshold." *Schriro*, 550 U.S. at 473. On this record, the Court of Appeals's conclusion that the Commonwealth satisfied its *Brady* obligation by eliciting testimony about his eligibility for a sentence reduction in time for Vejarano to make sure of that information at trial is not objectively unreasonable.

Vejarano also relies on *Monroe v. Angelone*, in which the U.S. Court of Appeals for the Fourth Circuit granted habeas relief after the petitioner discovered suppressed, exculpatory evidence during the habeas proceedings. *See* 323 F.3d 286 (4th Cir. 2003).[18] This included evidence that the government agreed to help a testifying witness obtain a reduced sentence. *Monroe*, however, does not parallel this case to the extent Vejarano suggests. In *Monroe*, the state court did not have an opportunity to review many pieces of suppressed, exculpatory evidence, so the Court considered the materiality of that evidence de novo. The case also involved five pieces of impeachment material against the only witness who testified about how the defendant "had planned her crime in advance of the event." *Id.* at 314. The impeachment material included deals the witness had received in exchange for her testimony. *Id.* at 314. During closing arguments, the prosecution explicitly argued that the witness had no reason to lie because "the absolute truth is that she did not ask for any consideration for her testimony from the Commonwealth in this case. And it's absolutely true that the Commonwealth has not promised her anything." *Id.* Here, the Commonwealth itself raised the possibility that Wargas could have his sentence reconsidered during cross-examination and did not represent that it had not made any offers to Wargas to induce his testimony. Thus, *Monroe* does not compel the Court to disturb the Court of Appeals's decision.

---

[18] Several of the other authorities Vejarano cites are out-of-circuit cases that do not bind the Court and have limited persuasive value.

Regardless, Vejarano's claim also fails at the materiality prong.  Indeed, because Vejarano fails to establish materiality under his *Napue* claim, he has likewise failed to show that "the government's evidentiary suppression undermines confidence in the outcome" of Vejarano's trial under the higher *Brady* materiality threshold.  *Id.* at 302; *see also Burr*, 19 F.4th at 411 ("[C]umulative evidence to that provided at trial . . . 'is generally not considered material for *Brady* purposes.'" (quoting *Juniper v. Zook*, 876 F.3d 551, 571 (4th Cir. 2017)); *cf. Bowman v. Stirling*, 45 F.4th 740, 756 (4th Cir. 2022) (holding suppressed impeachment evidence not material when the "testimony was helpful to the prosecution . . . [, but the witness] was by no stretch the centerpiece of the State's case"), *cert. denied*, 143 S. Ct. 2498 (2023).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the respondent's motion to dismiss and will deny Vejarano's § 2254 Petition.  An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A).  A judge will not issue a COA unless a petitioner makes a "substantial showing of the denial of a constitutional right."  *Id.* § 2253(c)(2).  A petitioner satisfies this requirement only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  No facts or law suggest that Vejarano is entitled to further consideration in this matter.  Thus, the Court will deny a COA.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 20 September 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge